## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHEAL W. BUCKNER, MICHAEL O. MCKOWN, PAUL B. PICCOLINI, WILLIAM P. HOBGOOD, CARL E. VANHORN, AND GAIL R. WILENSKY, as Trustees of the United Mine Workers of America Combined Benefit Fund, | |
| MICHEAL W. BUCKNER, MICHAEL O. MCKOWN, PAUL B. PICCOLINI, AND CARLO TARLEY, as Trustees of the United Mine Workers of America 1992 Benefit Plan, | Civil Action No. 1:23-cv-3524 |
| MICHEAL W. BUCKNER, MICHAEL O. MCKOWN, AND PAUL B. PICCOLINI, as Trustees of the United Mine Workers of America 1993 Benefit Plan, and | |
| MICHEAL W. BUCKNER, MICHAEL O. MCKOWN, AND PAUL B. PICCOLINI, as Trustees of the United Mine Workers of America Prefunded Benefit Plan, | |
| 2121 K Street, NW Washington, DC 20037, | |
| Plaintiffs, | |
| vs. | |
| XAVIER BECERRA Secretary of the United States Department of Health and Human Services 200 Independence Avenue, SW Washington, DC 20201, | |
| Defendant. | |

## COMPLAINT FOR DECLARATORY RELIEF AND SUMS DUE UNDER THE MEDICARE STATUTE

### INTRODUCTION

1.     Plaintiffs, the Trustees of the UMWA Combined Benefit Fund, the UMWA 1992 Benefit Plan, the UMWA 1993 Benefit Plan, and the UMWA Prefunded Benefit Plan (the "Funds" or "Plaintiffs"), bring this action to challenge a final agency decision of Defendant Xavier Becerra, the Secretary of the United States Department of Health and Human Services ("Secretary" or "Defendant"), as to (1) the imposition of an additional two percent sequestration reduction on the Medicare reimbursement to the Funds for healthcare services provided between April 1, 2013, and December 31, 2013; and (2) the extrapolation of alleged Medicare overpayments against the Funds in connection with the costs of healthcare services provided from January 1, 2012, through December 31, 2013.[1]

2.     The Funds is unique in the Medicare program.  In 1946, to resolve a nationwide strike in the coal industry, President Truman directed Secretary of the Interior Julius Krug to take possession of all bituminous coal mines and negotiate with the United Mine Workers of America ("UMWA") appropriate changes in the terms and conditions of employment of miners. Negotiations between Secretary Krug and UMWA President John L. Lewis produced the historic Krug-Lewis Agreement that ended the strike and led to the creation of benefit funds, financed by royalties on coal produced and payroll deductions from collective bargaining agreements between the UMWA and coal producing companies to provide health and pension benefits to retired coal miners and their dependents.  By the late 1980s, however, these health benefits were imperiled because many coal producers that were signatories to the collective bargaining

---

[1] Plaintiffs are the trustees of four health benefit plans that together with two pension plans make up the UMWA Health and Retirement Funds.

agreements went out of business.  So, Congress stepped in.  Through a series of enactments, Congress provided financial support to the Funds.  *See, e.g.*, Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), Pub. L. No. 102-486, §§ 19142–43, 106 Stat. 2776, 3036–56 (1992) (codified as amended at 26 U.S.C §§ 9701–22); Tax Relief and Health Care Act of 2006 ("TRHCA"), Pub. L. No. 109-432 div. C, tit. II, §§ 201–13, 120 Stat. 3006–27; Consolidated Appropriations Act, Pub. L. No. 115–31, div. M, tit. I, § 104, 113 Stat. 135, 803 (2017).  The Funds, as it exists today, is uniquely a creation of the federal government.

3.      Currently, most funding for the Funds' non-Medicare benefit programs comes from federal transfers from the Office of Surface Mining Reclamation and Enforcement ("Office of Surface Mining") within the Department of the Interior.  A small portion comes from funding by coal companies.  The Funds holds all these dollars in trust to provide *non-Medicare* benefits to Funds beneficiaries.  Funds beneficiaries who are entitled to Medicare receive their health insurance benefits from the Medicare program.  Thus, in general, the Department of the Interior pays for non-Medicare benefits, while the Secretary pays for Medicare benefits.

4.      The Funds has participated in the Medicare program since its inception as a Health Care Prepayment Plan ("HCPP"), as authorized by section 1833(a)(1)(A) of the Social Security Act, 42 U.S.C. § 1395*l*(a)(1)(A).  The Funds pays physicians for Medicare Part B services provided to Funds beneficiaries.  The Funds pays rates specified by the Medicare fee schedule, and the Secretary reimburses the Funds for these payments.

5.      When auditing the Funds' fiscal year 2012 and 2013 Medicare cost reports, the Secretary has steadfastly refused to acknowledge the Funds' statutory duties and its responsibility to safeguard moneys transferred from the Department of the Interior and from coal companies for the exclusive benefit of Funds' beneficiaries.  Instead, the Secretary has

unlawfully recouped moneys from the Funds in two ways.  First, in fiscal year 2013, the Secretary imposed federal budgetary sequestration upon the Funds, rather than the physicians who provided services to Funds beneficiaries.  Second, the Secretary extrapolated a small number of erroneous payments, but the Funds cannot recoup the extrapolated amounts from the service providers who hypothetically billed Medicare in error.

6.      The Funds implemented sequestration as required by the Balanced Budget and Emergency Deficit Control Act of 1985 ("BBEDCA") by reducing fee schedule payments by two percent to physicians and other suppliers.  BBEDCA, Pub. L. No. 99-177 ü 256, 99 Stat. 1037, 1087 (1985).  The Secretary then reduced the Funds' reimbursement for the period subject to sequestration by two percent, effectively doubling the sequestration adjustment to four percent.  The Secretary's four-percent sequestration adjustment violates the BBEDCA, which limits Medicare sequestration to two percent.  The Secretary's additional two percent reduction also violates the Coal Act and the Employee Retirement Income Security Act of 1974 ("ERISA") by forcing the Funds to pay the additional two percent from accounts reserved for non-Medicare health care benefits.  Additionally, the Secretary's duplicate sequestration violates the Medicare statute's prohibition on shifting Medicare costs to non-Medicare patients.

7.      The Secretary's use of statistical extrapolation to determine overpayment amounts to be recovered is not permitted in this case for two reasons.  First, it prevents the Funds from recouping the extrapolated amount from physicians in violation of the Coal Act, ERISA, and its governing plan documents.  Second, the Secretary's contractors did not comply with a limitation on extrapolation required by § 935(a) of the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), which forbids extrapolation unless the contractors determined that the Funds had a high or sustained error rate, and the contractors made no such finding.  42

U.S.C. § 1395ddd(f)(3). Accordingly, the extrapolation should be reversed, and payment should be withheld only for the claims actually audited and denied.

8.      Because the Secretary's imposition of an additional two percent reduction and the Secretary's improper extrapolation of alleged overpayments are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, the final decision on these issues must be set aside. 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

9.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare statute"), which establishes the Medicare program, and the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA").

10.     This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. §§ 701–706, 28 U.S.C. § 1331, and 42 U.S.C. § 1395oo(f)(1).

11.     Venue in this Court is proper under 28 U.S.C. § 1391(e) and 42 U.S.C. § 1395oo(f)(1).

## PARTIES

12.     Plaintiffs are the trustees of four health benefit plans and bring this action on behalf of those plans. Micheal W. Buckner, Michael O. McKown, Paul B. Piccolini, William P. Hobgood, Carl E. VanHorn, and Gail R. Wilensky are Trustees of the United Mine Workers of America Combined Benefit Fund. Micheal W. Buckner, Michael O. McKown, Paul B. Piccolini, and Carlo Tarley are Trustees of the United Mine Workers of America 1992 Benefit Plan. Micheal W. Buckner, Michael O. McKown, and Paul B. Piccolini are Trustees of the United Mine Workers of America 1993 Benefit Plan. Micheal W. Buckner, Michael O. McKown, and Paul B. Piccolini are Trustees of the United Mine Workers of America Prefunded Benefit Plan,

13.     The four benefit plans, together with two pension plans, are collectively known as the UMWA Health and Retirement Funds, which is a group of jointly administered multi-employer plans that provide pension, health, and other benefits to eligible retired coal miners and their eligible dependents.  The Funds participates in the Medicare program as an HCPP, as described in section 1833(a)(1)(A) of the Social Security Act.  42 U.S.C. § 1395*l*(a)(1)(A).  The Funds has HCPP contract number 90-091 with the Centers for Medicare and Medicaid Services ("CMS").  The Funds' HCPP includes four health plans: the UMWA Combined Benefit Fund, UMWA 1992 Benefit Plan, UMWA 1993 Benefit Plan, and UMWA Prefunded Benefit Plan. Together, as of October 31, 2023, these health plans provide health benefits to more than 54,000 beneficiaries, and approximately 42,000 of these beneficiaries are enrolled in Medicare.

14.     The Funds contests the final payment decision of the Secretary for its fiscal years ending December 31, 2012 ("FY 2012") and December 31, 2013 ("FY 2013").

15.     Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services and is the federal officer responsible for administering the Medicare program pursuant to the Social Security Act.  Defendant is sued in his official capacity.

## LEGAL BACKGROUND

### I.     The UMWA Health and Retirement Funds

The UMWA Health and Retirement Funds is the product of collective bargaining agreements and acts of Congress.  The Funds has provided pension and health care coverage for retired miners and dependents since 1946, predating the establishment of the Medicare program. The Funds is not part of the United Mine Workers of America.  The Funds is the collective reference to six employee benefit plans—two are pension plans and four are health plans.  The

four health plans, referred to herein as the Funds, are collectively an HCPP under section 1833 of the Social Security Act.

### A. The Coal Industry Retiree Health Benefit Act of 1992

16.     Prior to 1993, health care services for retirees and their dependents were financed through two funds, the UMWA 1950 Benefit Plan and the UMWA 1974 Benefit Plan, which were the result of collective bargaining agreements between the UMWA and the Bituminous Coal Operators' Association ("BCOA"), an association of coal industry operating companies. These plans were multiemployer employee benefit plans governed by ERISA, administered under the direction of trustees appointed by the UMWA and by the BCOA, on behalf of coal industry operating companies that employed the miners who, upon retirement, became beneficiaries of the plans.  Many of these producers later went out of business, while other producers ceased to be signatories to collective bargaining agreements and were not obligated to contribute to the benefit plans.  As a result, the 1950 and 1974 Benefit Plans faced serious financial challenges as the number of contributing coal producers declined.

17.     In 1992, Congress enacted the Coal Act "to stabilize plan funding and allow for the provision of health care benefits to such [coal industry] retirees."  Coal Act, Pub. L. No. 102-486, § 19142, 106 Stat. 2776, 3037 (1992).  The Coal Act merged the 1950 and 1974 Benefit Plans into a new UMWA Combined Benefit Fund ("Combined Fund").  26 U.S.C. § 9702(a)(2).

18.     The Combined Fund provides coverage for eligible pensioners who retired on or before July 20, 1992 who were receiving benefits on that date, and their eligible dependents.  *See id.* § 9703(f)(1).  The Combined Fund was required by the Coal Act to provide benefit coverage that would "to the maximum extent feasible be substantially the same as (and subject to the same limitations of) coverage provided under [the predecessor plans]."  *Id*. § 9703(b)(1).

19.     The Coal Act also directed the Settlors (the UMWA and the BCOA) to create a separate UMWA 1992 Benefit Plan ("1992 Plan") to provide health benefits to retirees and their dependents who would have been eligible for benefits under the 1950 or 1974 Benefit Plan based upon age and years of service as of February 1, 1993, who were not eligible for benefits under the Combined Fund (because they were not receiving benefits from the predecessor plans on July 20, 1992), who retired from the coal industry before September 30, 1994, and who were not receiving benefits from their former employers.  *Id*. § 9712(b)(2).  The Coal Act also requires the 1992 Plan to provide coverage that is substantially the same as that provided by the 1950 and 1974 Benefit Plans, in language essentially identical to that requiring the same of the Combined Fund.  *Id.* § 9712(c)(1).

20.     The Combined Fund receives funding from three sources.  First, the statute assesses premiums from coal operators who employed the relevant retirees.  26 U.S.C. § 9704(j)(4)(C).  Second, for the first three plan years, the statute transferred funds from the UMWA 1950 Pension Trust to the Combined Fund, primarily to reduce the premiums of assigned operators for those years.  *Id.* § 9705(a)(3)(A).  Third, the Coal Act, along with 1992 and subsequent amendments to the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), directs the United States Department of the Interior to transfer funds annually from the Abandoned Mine Reclamation Fund ("Reclamation Fund"), and from the United States Treasury, to the Combined Fund.  *Id.* § 9705(b)(1); 30 U.S.C. § 1232(h)–(i).  These monies "shall be used to pay benefits and administrative costs of beneficiaries of the Combined Fund." 26 U.S.C. § 9705(b)(2).  Today, approximately 85% of funding for the Combined Fund comes from monies transferred from the Departments of the Interior and/or Treasury.

21.     Under the original Coal Act, the 1992 Plan was financed entirely by premiums imposed by the Act upon coal operators that remained in business.  After 2006, the 1992 Plan has received most of its funding from similar transfers from the Reclamation Fund and/or the United States Treasury.  *Id*. § 9712(a)(3)(A); 30 U.S.C. §§ 1232(h)(2)(B), (i)(1)(B).  These funds "shall be used to provide the health benefits" of plan beneficiaries.  26 U.S.C. § 9712(a)(3)(B).

**B.     The 1993 Benefit Plan**

22.     The UMWA and the BCOA entered into the National Bituminous Coal Wage Agreement ("NBCWA") of 1993, and established the 1993 Plan to provide health and other non-pension benefits to pensioners who retired from coal mine employment after September 30, 1994, and whose last signatory employer is no longer in business.

23.     From its inception until 2006, when Congress amended the Coal Act and SMCRA, funding for the 1993 Plan was entirely from collectively bargained contributions from employers.  The retiree benefits provided by the 1993 Plan have been continued in successor NBCWAs.

24.     In December 2006, Congress passed the Tax Relief and Health Care Act of 2006 ("TRHCA"), which amended the SMCRA to provide expanded transfers to the Combined Fund, transfers to the 1992 Plan, as described above, and federal funding transfers for the 1993 Plan. TRHCA, Pub. L. No. 109-432, div. C, tit. II, §§ 202(d), 212(b), 120 Stat. 2922, 3010–15, 3025 (2006).  Section 212 of TRHCA requires that "[a]ny amount transferred . . . for any fiscal year shall be used to provide the health benefits described in section 402(h)(2)(C)(i) of the Surface Mining Control and Reclamation Act of 1977."  *Id.* § 212(b).  At that time, however, no federal funds could be used to provide benefits for any person who enrolled in the 1993 Plan on or after January 1, 2007 (i.e., the post-2006 beneficiaries).

25.      The Consolidated Appropriations Act, 2017 included the Health Benefits for Miners Act of 2017, which extended benefits to the post-2006 beneficiaries who were enrolled in the 1993 Plan as of May 5, 2017, and to certain individuals whose health benefits would be denied or reduced as a result of an employer bankruptcy proceeding commenced in 2012 or 2015, as set forth in the Health Benefits for Miners Act of 2017.  Consolidated Appropriations Act, Pub. L. No. 115-31, div. M, tit. I, § 104, 113 Stat. 135, 803 (2017).

26.      In 2016 and 2017, the 1993 Plan began administering health benefits for the active employees and retirees of certain coal companies and the UMWA, which are fully funded by the coal companies and the UMWA on a pay-as-you-go basis.  At present, the total number of beneficiaries in these employer programs of benefits is approximately 6,600 beneficiaries, which includes approximately 350 Medicare-eligible beneficiaries.

27.      The original Coal Act in 1992 directed that the Combined Fund and the 1992 Plan shall be plans governed by ERISA, and the 2006 amendments enacted by TRHCA described the 1993 Plan as such a plan.  26 U.S.C. §§ 9702(a)(30)(B)–(C), 9712(a)(2)(B)–(C); *see also* 30 U.S.C. § 1232(h)(2)(C)(i).

28.      Congress thus expressly intended that all of the rules applicable to ERISA-governed plans apply to these plans.  Under ERISA, the assets of an employee benefit plan must be held in trust for the exclusive purpose of providing benefits to plan beneficiaries.  29 U.S.C. § 1103(c)(1).  The benefits referred to in ERISA and in the Coal Act and SMCRA provisions described above are the non-Medicare benefits provided for in the governing plan documents. These plan documents have at all times excluded Medicare-covered services when provided to Medicare-eligible beneficiaries.  Moreover, the provisions for calculating the transfers to the

three plans that receive them under SMCRA all expressly call for netting Medicare

reimbursements from plan expenses in the calculations.  30 U.S.C. § 1232(h)(2)(A)–(C).

### C.      The Prefunded Benefit Plan

29.      The Funds now includes a fourth health plan:  the UMWA Prefunded Benefit Plan

("Prefunded Benefit Plan").  The Prefunded Benefit Plan was established by a January 1, 2008

agreement between the UMWA and the BCOA.  The Prefunded Benefit Plan provides health and

other non-pension benefits to a small number of eligible retired miners whose last signatory

employer was Carbon Operations of Indiana, LLC, Carbon Operations of Kentucky, LLC, or

Energy West Mining Co.

## II.      The Medicare Program and HCPPs

30.      Medicare is a public health insurance program that generally furnishes health

benefits to participating individuals once they reach the age of 65.  42 U.S.C. § 1395c.  Medicare

is established at Title XVIII of the Social Security Act.  The Medicare program consists of four

Parts:  A, B, C, and D.  Inpatient hospital services are paid under Part A of the Medicare statute.

*Id.* § 1395d.  Physician, hospital outpatient, and certain other services are paid under Medicare

Part B.  *Id.* § 1395k.  HCPPs are established in Medicare Part B.  *Id*. § 1395*l*(a)(1)(A).  Medicare

Part C is an optional managed care program that pays for services that would otherwise be

covered under Medicare Parts A and B.  *Id.* §§ 1395w-21–1395w-29.  Medicare Part D is an

optional insurance program for prescription drugs.  *Id.* §§ 1395w-101–1395w-154.

31.      The Secretary has delegated much of the responsibility for administering the

Medicare program to CMS, which is a component of the United States Department of Health and

Human Services.

A.     **Health Care Prepayment Plans**

32.     Since its inception in 1965, section 1833(a)(1) of the Social Security Act has permitted organizations that furnish or arrange for physician and other supplier services to receive reasonable cost reimbursement under Medicare Part B.  *Id*. § 1395*l*(a)(1)(A).  These organizations were initially known as Group Practice Prepayment Plans ("GPPPs").  *See* Medicare Program; Health Care Prepayment Plans, 47 Fed. Reg. 58252, 58253 (Dec. 30, 1982).

33.     In 1982, CMS promulgated regulations governing reasonable cost reimbursement under section 1833(a)(1)(A).  *Id.*  At that time, CMS began referring to GPPPs as HCPPs.  *Id.* The regulations require that an HCPP generally "[f]urnish physicians' services through its employees or under a formal arrangement with a medical group, independent practice association or individual physicians."  42 C.F.R. § 417.800(b)(1)(ii).  CMS has clarified that an "arrangement" in this context is a "written agreement executed between the HCPP and another entity in which the other entity agrees to furnish specified services to the HCPP's Medicare enrollees."  CMS, Medicare Managed Care Manual ("MMCM"), Pub. No. 100-16, ch. 18a, § 10.2.

34.     In general, an HCPP must "[f]urnish physicians' services through its employees or under a formal arrangement with a medical group, independent practice association or individual physicians."  42 C.F.R. § 417.800(b)(1)(ii).

35.     This HCPP regulation, however, includes what is commonly referred to as a "grandfathering" provision:

> An organization that, as of January 31, 1983, was being reimbursed on a reasonable cost basis under section 1833(a)(1)(A) of the Act, and that would not otherwise meet the conditions specified in paragraph (b)(1) of this section, may receive reimbursement on a reasonable cost basis as an HCPP, provided it files an agreement with CMS as required by § 417.801.

*Id.* § 417.800(b)(2) (hereinafter, "grandfathering provision").

36.     A grandfathered HCPP may receive reasonable cost reimbursement, even if it does not furnish physician services through its own employees or under a formal arrangement. *Id.*

37.     The MMCM acknowledges that an HCPP's liability for services furnished by a non-contracted physician will depend upon whether the physician participates in Medicare. MMCM, ch. 18b, § 40.1.  A Medicare participating physician who furnishes services to an HCPP beneficiary is bound by all Medicare rules: "The Medicare participation agreement is deemed to apply to such a physician's services in the sense that the physician may not bill the HCPP, the beneficiary, or any other party for any amount in excess of the Medicare allowed amount (the fee schedule amount or the actual charge, if lower)."  *Id.*

### B.     Medicare Cost Report Appeals

38.     Many health care providers that are paid under Medicare Part A are required to submit an annual "cost report" to a Medicare Administrative Contractor ("MAC"), which is a private company under contract with the Secretary to pay Medicare claims and audit hospital cost reports, among other duties.  42 U.S.C. § 1395kk-1; 42 C.F.R. § 413.24(f).  The MAC must analyze and audit the cost report and inform the hospital of a final determination of the amount of Medicare reimbursement through a Notice of Program Reimbursement ("NPR").  42 C.F.R. § 405.1803(a).

39.     A Medicare Part A provider may appeal a final determination of its Medicare reimbursement to the Provider Reimbursement Review Board ("PRRB").  42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1801–405.1889.

40.     At the end of each fiscal year, an HCPP must also submit a cost report, which reports its Medicare Part B costs incurred and the portion to be attributed to Medicare.  42 C.F.R. § 417.810.

41.     The Secretary uses the cost report to determine if the HCPP was underpaid or overpaid for the year, and by how much.  *Id.* § 417.810(c); *see also* MMCM, ch. 18a, § 20.2.1. The Secretary then sends the HCPP an NPR that states the amount that the HCPP owes CMS or the amount that CMS owes the HCPP.  *Id.*

42.     An HCPP may appeal a final determination of its Medicare reimbursement.  42 C.F.R. § 417.810(c)(2).  The Funds' appeal rights are described at 42 C.F.R. § 417.810(c)(2), which provides that an HCPP must be informed of its "right to have the determination reviewed at a hearing in accordance with the requirements specified in [42 C.F.R.] § 405.1801(b)(2) …."

43.     Unlike hospitals and other Part A providers of services, HCPPs may not obtain a hearing before the PRRB.  Rather, another hearing will be available to HCPPs if the amount in controversy is at least $1,000.  *Id.* § 405.1801(b)(2)(ii)–(iii).  However, HCPP appeals follow the regulatory procedural rules that apply to the PRRB to the "maximum extent possible."  *Id.* § 405.1801(b)(2)(iv).

44.      The CMS Administrator may review a hearing decision, but the CMS Administrator is not required to do so.  *Id.* § 405.1875(a).  A hearing officer's decision that is not reviewed by the CMS Administrator is final and binding on the parties.  *Id.* §§ 405.1871(b); 405.1877(a)(3).  If the CMS Administrator reviews the hearing officer's decision, the CMS Administrator's decision is a final decision that may be appealed to federal district court.  *Id.* § 405.1877(a).  If the CMS Administrator does not review the hearing officer's decision, the hearing officer's decision becomes a final agency decision that may be appealed to federal district court.  *Id.*

14

### C.        Statutory Limit on Extrapolation

45.        Section 935(a) of the MMA states that "[M]edicare contractor[s] may not use extrapolation to determine overpayment amounts to be recovered by recoupment, offset, or otherwise unless the Secretary [of Health and Human Services] determines that – (A) there is a sustained or high level of payment error; or (B) documented educational intervention has failed to correct the payment error."  42 U.S.C. § 1395ddd(f)(3); *see also* CMS, Medicare Program Integrity Manual ("PIM"), Pub. No. 100-08, ch. 8, § 8.4.1.2.  Payment history is an important factor in determining whether the level of error is "sustained" or "high."  PIM, ch. 8, § 8.4.1.4.

46.        Section 935(a) also forbids administrative or judicial review of a determination that an error rate is sustained or high (but not whether documented education has failed).  42 U.S.C. § 1395ddd(f)(3).

### D.        Sequestration

47.        In 2011, the BBEDCA was amended to impose across-the-board spending reductions on federal agencies beginning in 2013.  Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240 (amending the BBEDCA); American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, 126 Stat. 2313.  The BBEDCA exempts certain programs and activities from sequestration, however.  2 U.S.C. § 905.  The Combined Fund, the 1992 Plan, and the 1993 Plan are expressly exempt from sequestration.  *Id.* § 905(g).

48.        The statute caps the sequestration reduction on Medicare spending, which "shall not be more than 2 percent . . . ."  2 U.S.C. § 901a(6)(A).  If a two percent Medicare reduction would result in aggregate reductions not being met, then other federal agencies must absorb even greater reductions to ensure that the Medicare program is not cut by more than two percent.  *Id.* § 901a(7).

49.     The statute sets "special rules for" the Medicare program.  *Id.* § 906(d).  Among

these statutory "special rules" are requirements for when sequestration must be applied and

which entities must receive the two percent adjustment:

> (A) In general
>
>> Except as provided in subparagraph (B), if a reduction is . . . in payment
>> amounts pursuant to a sequestration order, the ***reduction shall be applied to
>> payment for services furnished*** during the effective period of the order. . . .
>
> (B) Payment on the basis of cost reporting periods
>
>> In the case in which payment for ***services of a provider of services*** is made
>> under title XVIII of the Social Security Act on a basis relating to the reasonable
>> cost incurred for the services during a cost reporting period of the provider, if a
>> reduction is made . . . in payment amounts pursuant to a sequestration order, the
>> reduction shall be applied to payment for costs for such services incurred at any
>> time during each cost reporting period of the provider any part of which occurs
>> during the effective period of the order, but only (for each such cost reporting
>> period) in the same proportion as the fraction of the cost reporting period that
>> occurs during the effective period of the order.

*Id.* § 906(d)(3) (emphasis added).

50.     The Office of Management and Budget ("OMB") issued a sequestration report on

March 1, 2013, that specifically noted the maximum two percent Medicare reduction.  Off. of

Mgmt. & Budget, Exec. Off. of the President, OMB Report to the Congress on the Joint

Committee Sequestration for Fiscal Year 2013, 1, 4 (2013),

https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/legislative_reports/fy13ombj

csequestrationreport.pdf.

51.     Also on March 1, 2013, the President issued an executive order implementing

sequestration and requiring "strict accordance with the requirements of section 251A of the Act

[2 U.S.C. § 901a] and the specifications of the Office of Management and Budget's report of

March 1, 2013, prepared pursuant to section 251A(11) of the Act."  Sequestration Order for

Fiscal Year 2013 Pursuant to Section 251a of the Balanced Budget and Emergency Deficit Control Act, as Amended, 78 Fed. Reg. 14633 (Mar. 1, 2013).

52.    CMS issued a memorandum dated March 22, 2013, addressed to Medicare Advantage Organizations, Prescription Drug Plans, Cost Plans, Program of All-Inclusive Care for the Elderly ("PACE") Organizations, and Demonstrations (collectively, "Medicare Health Plans"), stating that it would implement the required reduction beginning April 1, 2013, including against payments to Medicare Advantage plans and Medicare Part D sponsors.

53.    By memorandum dated May 1, 2013, CMS clarified that the two percent sequestration reduction was applicable to all Medicare Health Plans, including section 1833 cost plans, such as the Funds.  The memorandum stated that CMS would provide specific cost report preparation instructions to section 1833 cost plans at a later date.

54.    However, this subsequent guidance was not issued until December 11, 2013.  On December 11, 2013, CMS finally issued guidance specific to section 1833 cost plans.  The CMS memorandum directed HCPPs to calculate their total reimbursable costs and then calculate the sequestration adjustment by multiplying those costs by two percent.  The sequestration reduction was then subtracted from total reimbursable costs, which determined net total reimbursable costs. The guidance did not consider whether the total reimbursable costs were previously reduced by the two percent sequestration amount.

### FACTS SPECIFIC TO THIS CASE

55.    At all relevant times, including the present, the Funds' health plans have covered, for non-Medicare eligible beneficiaries, the same health care services provided by physicians and other suppliers as are covered by Part B of Medicare, and the Funds' health plans have excluded such coverage for Medicare eligible beneficiaries.  These health plans require that their

Medicare-eligible beneficiaries enroll in Medicare Part B.  This ensures that the assets of the plans are used exclusively to provide plan benefits and not to pay for Medicare benefits.  The Funds' medical claims processors keep records that distinguish between payments of claims for services provided to Medicare enrolled beneficiaries and those provided to non-Medicare beneficiaries.  Beneficiaries are free to choose any qualified physician, and physicians are paid on a fee-for-service basis.

56.     Currently, the Funds operates as a cost-reimbursed HCPP that pays physicians and suppliers on a fee-for-service basis.  Although the Funds is comprised of several benefit plans, it operates as an HCPP under one global contract with CMS.

57.     Consistent with the grandfathering provision, a beneficiary of the Funds' HCPP may see any Medicare participating physician.  All physicians are paid on a fee-for-service basis.  The Funds' HCPP pays physicians under the Medicare physician fee schedule applicable in the physician's locality.  CMS reimburses the Funds for 80% of the fee schedule amount, less any deductible.  The Funds pays the deductible and copayment amounts from its benefit plans.

58.     The Funds contracts with suppliers of durable medical equipment ("DME") and providers of non-emergency transport ("NEMT").  CMS reimburses the Funds for 80% of the contracted fee for DME and NEMT, and the Funds is responsible for the remainder.

59.     The Funds also contracts for the provision of certain services that are not covered by Medicare, such as hearing aids.  These services are outside the HCPP contract.

60.     To participate in the Funds' health plans, Funds beneficiaries are required to enroll in Medicare Part B if they are eligible.  In addition to providing the benefits allowed under Part B, the Funds also provides medical management services, utilization review, geriatric case management, and a call center.  The claims are administered by a third-party contractor.

61.    Consistent with the sequestration memoranda that CMS issued in March and May 2013, the Funds modified its claims processing system as of April 1, 2013, to effectuate the two percent sequestration reduction, lowering by two percent the payments made to physicians who provide Medicare Part B covered services to the Funds' beneficiaries.  Therefore, the Funds' total reimbursable costs reported on the 2013 final cost report already reflected the actual amount paid to physicians as reduced by the two percent sequestration adjustment.

62.    The December 11, 2013, CMS memorandum instructed HCPPs as follows:

Multiply the Total Adjusted Reimbursable Costs by the fraction of the cost reporting period that occurs after April 1, 2013. The numerator of this fraction is the number of months between April 1, 2013 and the end of the cost reporting period. The denominator of the fraction is the number of months in the cost reporting period. This results is Reimbursable Costs Subject to Sequestration.

63.    Because the Funds' HCPP has a Medicare cost reporting year that corresponds to the calendar year, only the nine months from April 1, 2013, through December 31, 2013, were subject to sequestration.  Thus, the December 11, 2013 CMS memorandum required the Funds to multiply its total reimbursable costs by 0.75 to account for the nine months subject to sequestration and to multiply the result by 0.02 to determine the two percent sequestration reduction to the adjusted costs.

64.    The Funds contacted CMS audit personnel in the Division of Plan Audits and described the Funds' calculation methodology, which accurately implemented sequestration. The Funds had already reduced its physician payments by two percent, but the Funds' administrative costs are also subject to sequestration.  Therefore, the Funds proposed to apply a two percent reduction to its administrative costs.  This reduction, in conjunction with the two percent reduction that had already been assessed against physician payments, would result in a two percent reduction in total payments that would otherwise have been made to the Funds.

65.     However, CMS audit personnel rejected the Funds' calculation.  The consistent message from CMS audit personnel was that the Funds should follow guidance issued in a March 4, 2014 Question and Answer ("Q&A") memorandum.  While that memorandum identified the issue—"How should a cost plan report physician costs where the cost plan has reduced its payments to physicians to parallel Medicare FFS pay cuts?"—it did not resolve the issue.  The memorandum simply noted that "the 2% payment reduction applies to the MCO's [Managed Care Organization's] reimbursable costs for the period covered by the sequestration" and advised cost plans to report actual payments made to physicians, in an amount that cannot be $0.  This response ignored the situation where—as with the Funds—the section 1833 cost plan has already reduced its payments to physicians to parallel Medicare fee-for-service payment cuts.

66.     By letter dated July 15, 2014, CMS provided its tentative settlement to the Funds. The tentative settlement assessed an additional two percent sequestration payment reduction on the Funds' FY 2013 Total Medicare Reimbursable Costs, as reported on Worksheet M, Line 21. Thus, CMS proposed to reduce by two percent those Part B payments that the Funds already discounted by two percent, effectively reducing those payments by four percent.

67.     By letter dated August 7, 2014, the Funds paid CMS under protest the amounts attributable to the duplicate two percent reduction to the Funds' Part B payments.

68.     On August 22, 2014, representatives of the Funds spoke with CMS officials in the Office of General Counsel and the Division of Capitated Plan Audits regarding the sequestration adjustment.  The Funds provided its position in writing on September 17, 2014, and requested that the agency intervene and reverse the duplicate sequestration adjustment.  The Funds explained that, as a grandfathered HCPP, it is not required to maintain contracts with physicians who treat Funds' beneficiaries.  For this reason, the Funds pays physician claims much like a

MAC.  Sequestration required that physicians nationwide accept a two percent reduction in fee schedule payments, and the Funds reduced its payments to physicians accordingly.  Imposing an additional two percent reduction on the Funds resulted in a four percent sequestration adjustment, which is contrary to the statutory cap of two percent imposed by the BBEDCA.

69.     On January 22, 2015, CMS responded that "[s]equestration must be enforced as against a Federal agency's expenditures, not a recipient's receipts."  CMS believed that it "must first determine the actual amount of costs incurred by a Medicare program recipient, and apply the 2% reduction against those actual costs."  CMS accused the Funds of "unilaterally" attempting "to shift the effects of the sequester on its physicians' service costs to physicians by reducing its payments to physicians."  By doing so, CMS asserted that "UMWA [sic] did not 'actually incur' the costs representing the difference between the amount UMWA [sic] paid and the amount UMWA [sic] would have paid had it not taken this action to reduce physician payments."  CMS concluded that the two percent reduction to physicians "was not paid and, thus, cannot be claimed on UMWA's [sic] cost report as a cost 'incurred', nor included in the determination of UMWA's [sic] 'reasonable cost' under § 1861(v)(1)(A)."

70.     Representatives of the Funds and CMS then met on March 10, 2015, to discuss the application of sequestration to the Funds.

71.     CMS responded by letter dated May 1, 2015, that its position was unchanged and referred to its January 22, 2015, letter.

72.     On May 19, 2015, the Funds again wrote to CMS explaining that the applicable budgetary resource for purposes of sequestration is CMS's obligation to pay physicians for services under Medicare Part B.  The Funds appropriately reduced these payments consistent with the treatment of physicians and suppliers nationwide.  The Funds also explained that CMS's

position is contrary to ERISA and the Coal Act because the additional two percent reduction

would have to be paid from funds held in trust for beneficiaries of the Funds.  Accordingly, the

Funds requested that CMS revise its cost reporting instructions to permit the Funds to report the

two percent sequestration adjustment that it applied to payments to physicians and other

suppliers.

73.     By letter dated June 12, 2015, CMS rejected the Funds' arguments with no

explanation and informed it that it could appeal the additional sequestration adjustment within

180 days of the FY 2013 NPR.

74.     CMS contracted with two companies to audit the Funds' FY 2012 and FY 2013

cost reports.  Sagebrush Solutions ("Sagebrush") audited claims that the Funds paid on behalf of

the Medicare program.  Sagebrush also conducted a statistical sampling and extrapolation of the

paid claims for each fiscal year.  Kearny & Company ("Kearny") audited all other aspects of the

cost reports, including applying Sagebrush's findings to the cost reports.

75.     By letter dated July 18, 2017, CMS issued a consolidated NPR for the Funds FY

2012 and FY 2013.

76.     For FY 2012, Sagebrush audited 216 physician claims and informed the Funds

that it had determined that eight of the claims, valued at $425, were in error.  Kearney calculated

a 1.15% error rate of the physician claims based on the dollar value of the claims.  Kearny

extrapolated the 1.15% error into an overpayment of $279,271.

77.     For FY 2013, Sagebrush audited 195 physician claims and informed the Funds

that it had determined that 13 of the claims, valued at $808, were in error.  Kearney calculated a

2.84% error rate of the physician claims based on the dollar value of the claims.  Kearny

extrapolated the 2.84% error into an overpayment of $1,327,525.

78.     Neither Sagebrush nor Kearney made a determination that the Funds' error rate was high or sustained or that the Funds had received prior, documented educational intervention on the types of errors that Sagebrush identified.  Instead, Sagebrush imposed a "materiality" threshold of one percent.  According to Sagebrush, it would extrapolate its findings to the universe of claims if one-percent or more of the sampled claims were found to be in error.

79.     For FY 2013, Kearney also imposed a two percent sequestration reduction on the Funds reimbursable costs for the period from April 1, 2013, through December 31, 2013, even though the Funds already reduced payments to physicians and suppliers by two percent.

80.     By letter dated January 9, 2018, the Funds timely appealed the July 18, 2017 NPR.  The Funds appealed six issues, including the following: (1) Whether CMS properly applied a sequestration adjustment to the Funds' FY 2013 cost report; and (2) whether CMS may calculate an extrapolated overpayment against the Funds.

81.     On July 10, 2020, the Hearing Officer issued a decision in the FY 2012 and FY 2013 appeal.  On sequestration, the Hearing Officer held that CMS's application of a sequestration reduction was improper.  The types of services at issue are Medicare Part B services from non-contracted providers pursuant to 2 U.S.C. § 906(d)(1)(A), which applies sequestration to "individual payments for services."  The Hearing Officer also held that the Funds reasonably interpreted CMS sequestration guidance.  Regarding the Coal Act and ERISA, the Hearing Officer stated, "CMS did not expressly offer counter-arguments regarding these particular authorities. The Hearing Officer need not reach the question whether the adjustment also violates such authorities."

82.     The Hearing Officer also held that CMS erred in calculating an extrapolated overpayment:

The Hearing Officer concurs with the Funds' summation that "[m]any of the same faults with CMS's assessment of sequestration also applied to extrapolation." Tr. at 23. The UMWA Funds is a unique entity which was born from a collective bargaining agreement and Congressional acts, that simply processes and pays Part B claims utilizing a fee-for-service model on a fiduciary basis. See Joint Stipulation at 1 (April 10, 2019); Tr. at 9.10 The Hearing Officer agrees with the UMWA Funds that it functions like a MAC in paying claims. It follows that CMS should not impose liability on the UMWA Funds for the errors of service providers. Unlike individual providers that may be liable for overpayments on an extrapolated basis, the Funds acts as an agent of CMS to process payments.

83.     On her own motion, the CMS Administrator reviewed the Hearing Officer's findings.  On September 10, 2020, the CMS Administrator reversed the Hearing Officer on the two issues relevant to this action.  The CMS Administrator held that "[t]he payment reductions required by sequestration apply to Medicare payments made to the cost plan's costs of furnishing services, not to payments made by a cost plan to its physicians."  The CMS Administrator held that the duplicate sequestration adjustment did not impermissibly shift costs to non-Medicare payers, and the CMS Administrator further denied that the duplicate sequestration adjustment violated the Coal Act or ERISA.

84.     On extrapolation, the CMS Administrator held that the Funds was not "acting as a Medicare contractor."  The CMS Administrator concluded that the Funds "is subject to the reasonable cost reimbursement rules and, thus, is subject to having an overpayment determined by extrapolation."  The CMS Administrator stated that "It is reasonable to assume that Congress was aware" of the Coal Act and ERISA when it enacted section 1833(a) of the Social Security Act and therefore "authorize[d] the reasonable cost payment methodology for these organizations," including extrapolating overpayments.

85.     The CMS Administrator also remanded several other issues to the Hearing Officer to conduct further proceedings and to issue a decision on remand incorporating the CMS Administrator's decision on sequestration and extrapolation.

86.     On September 27, 2023, the Hearing Officer issued a remand decision, finding

against the Funds on the remaining issues and incorporating the CMS Administrator's decision

on sequestration and extrapolation.

87.     By letter dated November 13, 2023, CMS notified the Funds that the CMS

Administrator would not review the Hearing Officer's September 27, 2023, decision.

88.     The Hearing Officer's September 27, 2023, decision constitutes the Secretary's

final agency action on the Funds' FY 2012 and FY 2013 appeal.

### COUNT I
### Violation of the BBEDCA - Duplicate Sequestration

89.     Plaintiffs reallege and incorporate by reference paragraphs 1–88 as if fully set

forth below.

90.     The BBEDCA requires the Secretary to impose the two percent sequestration

adjustment on physicians, and the BBEDCA is clear that Medicare reductions "shall not be more

than 2 percent."  2 U.S.C. § 901a(6)(A).

91.     The President's 2013 Executive Order mandated that sequestration shall be

implemented in "strict accordance with the requirements of section 251A of the Act [2 U.S.C. §

901a] and the specifications of the Office of Management and Budget's report of March 1, 2013,

prepared pursuant to section 251A(11) of the Act."  Sequestration Order for Fiscal Year 2013

Pursuant to Section 251a of the Balanced Budget and Emergency Deficit Control Act, as

Amended, 78 Fed. Reg. 14633 (Mar. 1, 2013).  The BBEDCA freezes Medicare sequestration at

two percent, and this is correctly reflected in OMB's March 1, 2013 sequestration report that

specifically incorporates the statutory maximum two percent Medicare reduction:  "Pursuant to

sections 251A(8), 255, and 256 of BBEDCA, most mandatory spending is exempt from

sequestration or, in the case of the Medicare program and certain health programs, is subject to a

2 percent limit on sequestration."  Off. of Mgmt. & Budget, Exec. Off. of the President, OMB

Report to the Congress on the Joint Committee Sequestration for Fiscal Year 2013, 1, 4 (2013).

The OMB report does not mandate a two percent reduction in reported costs as the Secretary

asserts—rather, the OMB report requires that the United States Treasury expend two percent less

in Medicare funds than if sequestration had not taken effect.  *Id*.

92.     Because the Funds reduced its Part B payments by two percent, its reported costs

already reflected the sequestration adjustment, and no additional reduction to those costs is

necessary to comply with the BBEDCA and the OMB report.

93.     The Secretary has instead implemented sequestration by requiring the Funds to

lower its reported costs by two percent, thus further cutting the Part B payments that the Funds

already reduced for FY 2013.  For the health care services provided to Medicare beneficiaries

covered by the Funds, the Secretary has imposed a four percent reduction for FY 2013.

94.     By applying an additional two percent reduction on top of the equivalent

reduction already levied by the Funds, the Secretary violated the limit on the reduction that may

be made to Medicare reimbursement under BBEDCA.  *See* 2 U.S.C. § 901a(6).  The additional

two percent reduction is contrary to the plain language of the BBEDCA, the President's

Executive Order, and the OMB's sequestration report.

95.     Further, the Secretary improperly applied sequestration to the Plaintiffs' cost

report at the end of the year in violation of the BBEDCA.

96.     The BBEDCA requires the Secretary to apply sequestration to individual

physicians and suppliers, not to the Funds' cost report at the end of the year.  The BBEDCA sets

"special rules for" the Medicare program.  *Id*. § 906(d).  "In the case of parts A and B" of

Medicare, sequestration applies to "individual payments for services furnished."  *Id*. §

906(d)(1)(A).  But, for Medicare Part C (managed care) and Part D (prescription drugs),

sequestration applies "to monthly payments under contracts under such parts for the same one-

year period."  *Id.* § 906(d)(1)(B).

97.     The Funds' HCPP is established under Part B of Medicare, and all of the services

in question are Part B services.  Thus, § 906(d)(1)(A) requires the Secretary to apply

sequestration to the "individual payments for services furnished" by physicians and other Part B

suppliers who treated the Funds' beneficiaries.

98.     Non-contracted physicians and suppliers accepting assignment are required to

accept Medicare fee schedule limits:  "The HCPP is allowed to use the Medicare FFS payment

limits for these services rendered on or after April 1, 1990."  MMCM, ch. 18b, § 40.  The

amendments to § 256(d) of the BBEDCA require that those fee schedule limits be reduced

during the sequestration period for all "individual payments for services furnished."  2 U.S.C. §

906(d)(1), (d)(3)(A).  Further, the amendments to § 265(d) of the BBEDCA mandate that

suppliers accept payments reduced by the two percent sequestration amount as payment in full.

*Id.* § 906(d)(5).

99.     The Secretary and the Funds were, therefore, required by the BBEDCA to reduce

payments to physicians and suppliers during the sequestration period for individual payments for

services furnished.  This is exactly how the Secretary treated Medicare Advantage Organizations

("MAOs").  The Secretary's May 1, 2013, sequestration memorandum permitted MAOs to

reduce payments to non-contracted physicians by two percent.  The Secretary entitles MAOs to

pay non-contracted physicians at the Medicare fee schedule rate.  42 C.F.R. § 422.214(a).  The

premiums that the Secretary pays to MAOs are actuarially adjusted to account for these

payments.  The Secretary implemented sequestration by reducing the MAO premiums by two

percent, and CMS permitted MAOs to pass this reduction on to non-contracted physicians by reducing their payments by two percent.

100.    The Secretary's position that sequestration must instead be applied to the Funds' cost report and borne solely by the Funds is directly contradicted by the statute.  Section 906(d)(3)(A) establishes the "general" rule that "the reduction shall be applied to payment for services furnished during the effective period of the order."  2 U.S.C. § 906(d)(3)(A).  Subsection (d)(3)(B) states an exception to the general rule that is applicable only to "provider[s] of services," and imposes sequestration on a cost reporting basis to these entities.  *Id.* § 906(d)(3)(B).  "Provider of services" is a defined term in the Social Security Act that does not include HCPPs.  42 U.S.C. § 1395x(u).  For purposes of Medicare, the Social Security Act defines "provider of services" to mean a limited subset of health care providers that are generally paid under Medicare *Part A*, such as hospitals, skilled nursing facilities, and other cost-reimbursed health care providers and related entities.  *Id.*

101.    The Funds is an HCPP authorized under Medicare *Part B* at section 1833 of the Social Security Act and may only pay for Part B services.  *Id.* § 1395*l*(a)(1)(A).  Subsection 906(d)(3)(B) does not apply to the Funds' HCPP because it is not a provider of services.  Therefore, § 906(d)(3)(B) does not apply to the Funds.

102.    Instead, the Funds is subject to the general rule at subsection 906(d)(3)(A) that sequestration must be applied to services furnished during the sequestration period.  2 U.S.C. § 906(d)(3)(A).  Unlike the exception at subsection 906(d)(3)(B), subsection (d)(3)(A) does not mandate reductions on a cost reporting period.  *Id.*  The services paid by the Funds and furnished during the sequestration period were all rendered by physicians and other Part B suppliers, and subsection 906(d)(3)(A) thus required the Funds to reduce payments to those physicians and

suppliers during the sequestration period.

103.    Even with respect to contracted health care suppliers, the BBEDCA does not

apply to the Funds because the Funds does not directly "furnish" those health care services.  The

Coal Act established the Funds as a payer of health care services, not a provider of health care

services.  The Secretary's HCPP grandfathering provision acknowledges that the Funds is not

required to provide services and instead may pay Part B claims on behalf of the Medicare

program.  *See* 42 C.F.R. § 417.800(b)(2).  Under the BBEDCA's special provisions for

Medicare, the reductions apply only to the party that "furnished" the services.  2 U.S.C. §

906(d)(1)(A).  The BBEDCA does not permit the Secretary to impose sequestration on costs that

are for services by the furnishing physicians and health care suppliers, not the Funds.

104.    Further, the statutory and regulatory scheme makes the Funds HCPP an agent of

the Secretary for purposes of payment to Medicare Part B physicians and suppliers.  The

Secretary would otherwise be required to pay for these Part B services through its MACs, which

would have reduced payments to physicians by two percent.  When the Funds reduced the

payments to physicians by two percent under this statutory and regulatory scheme, as CMS

guidance for the sequestration implementation directed on May 1, 2013, it reduced the liability

by the same amount.  This is so, because the BBEDCA requires such physicians to accept these

reduced payments as payment in full.  2 U.S.C. § 906(d)(5).

**COUNT II**
**Violation of the Coal Act - Duplicate Sequestration**

105.    Plaintiffs reallege and incorporate by reference paragraphs 1–88 as if fully set

forth below.

106.    When the Secretary imposed sequestration upon the Funds rather than individual

physicians, the Secretary seized the two percent reduction from Coal Act funds that are exempt

from sequestration.  2 U.S.C. § 905(g).  The Secretary's duplicate sequestration adjustment is contrary to the Coal Act and other related federal statutes that strictly limit the use of federal funds to providing health benefits to beneficiaries of the Funds.

107.    The Secretary takes the position that the Funds must solely bear the cost and burden of the two percent sequestration adjustment, and the Secretary asserts that the Funds may not pass the sequestration adjustment on to the health care providers that treated the Funds' beneficiaries.  The Secretary's imposition of the sequestration adjustment on the Funds violates these statutory provisions by seizing funds that Congress has allocated for the use of Funds beneficiaries.

108.    The Funds appropriately assessed the two percent sequestration adjustment on physicians and suppliers as Congress intended.  The Secretary may not force the Funds to pay for sequestration from its benefit funds.  A substantial part of the Funds' Health Plan assets is funded by transfers from the Reclamation Fund and the United States Treasury, pursuant to the Surface Mining Act amendments of 2006.  30 U.S.C. § 1232(h)–(i).  These transfers are expressly exempt from sequestration.  2 U.S.C. § 905(g)(1)(A).  By effectively requiring the Funds to pay the sequestration reductions from these transfers rather than imposing the reductions on Part B suppliers, the Secretary has violated the express statutory exemption of these funds from sequestration.

109.    Furthermore, federal statutes require that the monies transferred to the Funds must be used exclusively to provide health care services under the Funds' plans of benefits that do not include Medicare benefits.  The statute originally directed the United States Department of the Interior to transfer funds annually from the Reclamation Fund to the Combined Fund to cover the plan expenses of "unassigned beneficiaries," for whom no operator premiums were paid.  26

U.S.C. § 9705(b)(1); 30 U.S.C. § 1232(h)–(i).  Following the amendments of the TRHCA of

2006, transfers from the Reclamation Fund and from the Treasury come to the Combined Fund,

the 1992 Plan, and the 1993 Plan.  30 U.S.C. § 1232(h)–(i).  These monies "shall be used to pay

benefits and administrative costs of beneficiaries of the Combined Fund or for such other

purposes as are specifically provided in the Act . . . ."  26 U.S.C. § 9705(b)(2).  The 1992 Benefit

Plan is financed principally through similar transfers from the Reclamation Fund and the

Treasury.  *Id.* § 9712(a)(3)(A).  These funds "shall be used to provide the health benefits" of plan

beneficiaries.  *Id.* § 9712(a)(3)(B).  Federal funds transferred into the 1993 Plan "shall be used to

provide the health benefits."  *Id.* § 97192(a)(4)(B).  These statutes do not permit the Secretary to

seize these funding sources.  The funds must instead be used to pay for health care services under

the Funds' plans of benefits.

110.    The Secretary has taken assets from the health plans that are not permitted to be

used for non-health care purposes.

## COUNT III
### Violation of the Medicare Statute - Duplicate Sequestration

111.    Plaintiffs reallege and incorporate by reference paragraphs 1–88 as if fully set

forth below.

112.    Under section 1833, HCPPs are to be reimbursed for the reasonable cost of the

health care services provided to Medicare beneficiaries.  42 U.S.C. § 1395*l*(a)(1)(A).

"Reasonable cost" is generally defined under the Medicare statute as "the cost actually incurred,

excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of

needed health services."  *Id.* § 1395x(v)(1)(A).  In defining reasonable costs, the statute

expressly mandates that "the necessary costs of efficiently delivering covered services to

individuals covered by the insurance programs established by this subchapter will not be borne

by individuals not so covered . . . ." *Id.* CMS's regulations also incorporate this cost-shifting prohibition. 42 C.F.R. § 413.9(b)(1).

113. The Secretary cannot arbitrarily impose costs on non-Medicare payers. *Saint Mary of Nazareth Hosp. v. Schweiker*, 718 F.2d 459, 473–74 (D.C. Cir. 1983) (Secretary may not irrationally reduce reimbursement for Medicare costs, forcing non-Medicare payers to bear those costs).

114. By reducing the amount of reimbursement paid to the Funds for Medicare Part B reimbursable services provided between April 1, 2013, and December 31, 2013, the Secretary violated the prohibition against redistributing Medicare expenses to non-Medicare beneficiaries. The Funds has no choice but to pay the additional two percent sequestration adjustment from accounts that provide health care services to the Funds' non-Medicare beneficiaries and services and costs to Medicare beneficiaries that are not covered by Medicare. The additional sequestration adjustment violates the cost-shifting prohibition at 42 U.S.C. § 1395x(v)(1)(A) and 42 C.F.R. § 413.9(b)(1) because this additional adjustment will be "borne by individuals not so covered" by Medicare. Therefore, the duplicate sequestration adjustment is contrary to the Medicare statute and regulations.

## COUNT IV
### Violation of ERISA - Duplicate Sequestration

115. Plaintiffs reallege and incorporate by reference paragraphs 1–88 as if fully set forth below.

116. Under ERISA, plan assets are required by law to be held in trust and used exclusively for the purpose of defraying reasonable expenses of administering the plan and providing benefits to participants and their beneficiaries. 29 U.S.C. §§ 1103(c), 1104(a)(1)(A). Congress's intent in enacting ERISA was to offer participants this "enhanced protection for their

benefits." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

117.    The Department of Labor has long construed this exclusive purpose requirement as prohibiting the subordination of the interests of participants and beneficiaries to unrelated objectives.  ERISA Advisory Opinion No. 2008-05A (U.S. Dep't of Labor, Emp. Benefits Sec. Admin. June 27, 2008).  The expenditure of assets to "pay costs or expenses that should be borne by a plan sponsor or other entity in the ordinary course of its business or operation violates ERISAs [sic] prudence and exclusive purpose requirements." *Id.*  The Department of Labor has "consistently rejected a construction of ERISA that would render ERISA's tight limits on the use of plan assets illusory . . . ." *Id.*

118.    Courts have consistently held that the use of plan assets for reasons unrelated to the purpose of the plan, such as an employer using plan assets to pay creditors or to cover its operating expenses, violates ERISA's exclusive purpose requirements.  *See LoPresti v. Terwilliger*, 126 F.3d 34, 40–41 (2d Cir. 1997); *Yeseta v. Baima*, 837 F.2d 380, 385–86 (9th Cir. 1988); *Connors v. Paybra Mining Co.*, 807 F.Supp. 1242, 1246 (S.D.W. Va. 1992), *appeal dis'd*, 21 F.3d 421 (4th Cir.1993).

119.    Moreover, ERISA requires an employee benefit plan to specify the basis on which payments are made to and from the plan.  29 U.S.C. § 1102(b)(4).  The plan's assets must be used in accordance with the plan's governing documents and instruments.  *Id*. § 1104(a)(1)(D). The written terms of the plan, as evidenced by the plan's governing documents and instruments, are the "linchpin" of the ERISA statutory scheme.  *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013); *see also Egelhoff v. Egelhoff ex. rel. Breiner*, 532 U.S. 141, 147–48 (2001) (recognizing the requirement to "administer the plan 'in accordance with the documents and instruments governing the plan,'" as a "central matter of plan administration").

Accordingly, "evaluating the propriety of [a] payment by a plan" necessitates "an examination of the language of the plan documents."  ERISA Advisory Opinion No. 1997-03a (U.S. Dep't of Labor, Emp. Benefits Sec. Admin. Jan. 23, 1997).

120.    By imposing sequestration on the Funds and not physicians and suppliers, the Secretary violates ERISA by forcing the Funds to use other assets of the health care plans that participate in the HCPP.  The Funds is forced to use assets held in trust for ERISA plan participants to make non-reduced payments for Medicare covered services, which subordinates the interests of the participants and beneficiaries in order to achieve an unrelated Medicare sequestration adjustment.  The Secretary may not require the Funds to pay the duplicative sequestration adjustment from the plans' assets.  The depletion of these assets is not reimbursed by the Secretary because the Secretary has reduced the amount of total costs reported on the Funds' HCPP cost report.  Even if the Funds could recoup the duplicate adjustment from the physicians and suppliers, CMS would then claw back those funds because any recoupments from physicians would reduce the Funds' total reimbursable costs.  By forcing the Funds to use assets held in trust for ERISA plan participants to make non-reduced payments for Medicare covered services, the Secretary subordinates the interests of the participants and beneficiaries in order to achieve an unrelated Medicare sequestration adjustment.

121.    Moreover, forcing the Funds to use plan assets in a manner not in accordance with the plans' governing documents is contrary to a "central" provision of ERISA.  The health care plans that participate in the HCPP did not specify that payments may be made from the plans in order to satisfy the sequestration adjustment.  In fact, the plan documents of all the Funds' Health Plans that participate in the HCPP expressly exclude services provided under Medicare from their coverage.  Therefore, the duplicate sequestration adjustment is contrary to ERISA.

## COUNT V
## Violation of MMA Section 935(a) - Extrapolation

122.    Plaintiffs reallege and incorporate by reference paragraphs 1–88 as if fully set forth below.

123.    The Medicare statute at 42 U.S.C. § 1395ddd(f)(3) is a general prohibition on extrapolation unless specific, narrowly confined extenuating circumstances are present.  42 U.S.C. § 1395ddd(f)(3).  A contractor is forbidden from extrapolating unless it finds that the error rate is high, sustained, or that documented educational intervention has failed.  *Id*.

124.    In enacting MMA § 935(a), Congress intended to limit contractors' use of extrapolation to the more egregious error rates.  If Congress had intended to endorse extrapolation in all cases, it would have said so.  Instead, Congress required a "high" error rate.

125.    The Secretary's contractors, Sagebrush and Kearny, were not permitted to extrapolate their audit findings because they failed to comply with this statute, 42 U.S.C. § 1395ddd(f)(3).  The contractors failed to make a threshold finding of a high error rate before extrapolating.  The contractors also did not find that the Funds had a sustained error rate or that documented educational intervention had failed to correct prior problems.  Sagebrush's and Kearny's extrapolation is invalid because they failed to make any of these findings.

126.    The Funds' FY 2012 error rate was only 1.15%, and the FY 2013 error rate was 2.84%.  Error rates of 1.15 and 2.84 are not high.  The Funds' alleged error rates are far below any reasonable threshold for overcoming the MMA's prohibition on extrapolation.

127.    Instead, the Secretary's contractors imposed extrapolation based on a "materiality" threshold of one percent.  "Material" is not "high."  "Material" is a much lower threshold than "high."

128.    By merely setting a materiality threshold, the contractors did not comply with

their obligation to make a finding of a "high" error rate.

129.    Therefore, the Secretary violated MMA § 935(a) by extrapolating its contractors' findings to the Funds.  Accordingly, the extrapolation should be reversed, and payment should be withheld only for the claims actually audited and denied.

**COUNT VI**
**Violation of the Coal Act - Extrapolation**

130.    Plaintiffs reallege and incorporate by reference paragraphs 1–88 as if fully set forth below.

131.    When Congress enacted the Coal Act, it was clear that the Funds was a payer of health care services, not a provider of health care services.  The Coal Act required that the Combined Fund and 1992 Plan provide substantially the same coverage as had been provided by the UMWA 1950 and 1974 Benefit Plans prior to the 1992 enactment.  Those predecessor plans did not employ or contract with physicians but provided benefits in the form of payments to any qualified providers chosen by the beneficiaries.  Congress used different terms to describe the "benefits" provided by the Combined Fund, which were described as resulting in "payments," as opposed to "services" provided by direct providers of health care: "The trustees of the Combined Fund shall negotiate **payment** rates with the health care services plans described in paragraph (1). . . ."  26 U.S.C. § 9703(b)(2)(A) (emphasis added).

132.    Likewise, the Coal Act emphasized that services to Funds beneficiaries would be provided by third parties, not the Funds:

> The trustees of the Combined Fund shall not enter into an agreement under paragraph (1) with any provider of **services** which is of a type which is required to be certified by the Secretary of Health and Human Services when providing services under title XVIII of the Social Security Act unless the provider is so certified.

*Id.* § 9703(b)(3) (emphasis added).

133.    As with the Combined Fund in section 9703(b), the Coal Act described the 1992

Plan as providing payments for health care services, as opposed to directly providing such

services:

> The 1992 UMWA Benefit Plan shall develop managed care and cost containment rules which shall be applicable to the **payment** of benefits under this subsection. . . . Such rules shall preserve freedom of choice while reinforcing managed care network use by allowing a point of service decision as to whether a network medical provider will be used.  Major elements of such rules may include, but are not limited to, elements described in paragraph (3).

*Id.* § 9712(c)(2) (emphasis added).

134.    None of the rules described in paragraph (3) of § 9712(c), which the trustees

could adopt in their discretion, would thrust the 1992 Plan into the role of directly providing

health care services.  One of the paragraph (3) rules has been adopted by the Funds, which again

refers to the Funds as a payer:

> (C) limiting benefit **payments** to physicians to the allowable charge under title XVIII of the Social Security Act, while protecting beneficiaries from balance billing by providers.

*Id.* § 9712(c)(3)(C) (emphasis added).

135.    Subsequent to the 1992 Coal Act, Congress enacted supplemental appropriations

for the Combined Fund in 1999, 2001, and 2003 to cover shortfalls caused by coal operator

premium delinquencies or to cover the deficits in the Combined Fund.  Consolidated

Appropriations Act, Pub. L. No. 106-113, appendix C, tit. V § 501, 113 Stat. 1501, 1536 (1999);

Department of Interior and Related Agencies Appropriations Act, Pub. L. No. 106-291, tit. VII §

701, 114 Stat. 922, 1022 (2000); Consolidated Appropriations Resolution, Pub. L. No. 108-7,

div. F, tit. I § 153, 117 Stat. 11 (2003).  None of these enactments changed the Funds from an

administrator of payments to a provider of health care services.

136.    In 2006, Congress amended the Coal Act and SMCRA significantly to extend

federal transfers of funds to the Combined Fund for all expenses not paid for by coal operator premiums, not just those of unassigned beneficiaries, and to extend federal funding for the first time to the 1992 Plan and the 1993 Plan.  TRHCA, Pub. L. No. 109-432, div. C, tit. II, § 212, 120 Stat. 2922, 3023 (2006).  The statutory formulas for calculating these transfers for all three plans expressly reduce the total expenses covered by the transfers by the amounts the plans receive from CMS for Medicare-covered services for which the plans pay providers of those services.  30 U.S.C. § 1232(h)(2).  Subsequent amendments have not changed this structure but have added beneficiaries who could be eligible for transfers to the 1993 Plan.  Consolidated Appropriations Act, Pub. L. No. 115–31, div. M, tit. I, § 104, 113 Stat. 135, 803 (2017).  Throughout this extended legislative process, Congress has recognized the Funds' health plans as payers for health care services, rather than direct providers of such services, and as a continuing contractor with the Medicare program to receive payments from CMS to reimburse the plans for payments for Medicare-covered services.

137.    The Secretary's HCPP grandfathering provision recognizes the Funds' unique role as a payer for services.  *See* 42 C.F.R. § 417.800(b)(2).  Because the Funds was an HCPP as of 1983, it is not required to provide health care services directly or under arrangement.  *Id.*  It pays Part B claims on behalf of the Medicare program.

138.    In carrying out its statutory duty to provide health benefits to coal industry retirees, the Funds functions as a payer of Medicare claims.  If a MAC pays a physician who submits an improper bill, the Medicare program seeks recoupment from the physician, not the MAC.  42 U.S.C. § 1395kk-1(d)(3)(A).  This same principle should apply to the Funds because Medicare regulations do not require it to contract with physicians, and Medicare manuals acknowledge that ultimate liability rests with the physician for non-contracted services provided

to HCPP beneficiaries.  *See* MMCM, ch. 18b, § 40.1.  Indeed, Congress intended for the Funds to act as a payer, not a provider, and treating the Funds like a MAC is consistent with the statutory scheme of the Coal Act.  It is, therefore, improper to calculate an overpayment by extrapolation, placing financial liability upon the Funds for the errors of physicians and suppliers.

139.    Moreover, the Coal Act requires that the Funds have a means to recoup any overpayments made to physicians.  The statutory purpose of the Coal Act is to provide "delivery of health care benefits to the beneficiaries" of the Funds' health plans.  Coal Act, Pub. L. No. 102-486, § 19142, 106 Stat. 2776, 3037 (1992).  The statutory mandate to use all funds transferred from the Reclamation Fund for "health benefits" and to "use all amounts" contributed by coal companies "exclusively to pay premiums" for health care is violated by extrapolation because the Funds is forced to subsidize services that the Medicare program itself contends were not reasonable or properly billed health benefits.  26 U.S.C. §§ 9705(b)(2), 9712(a)(3)(B), (a)(4)(B).  This subsidization occurs because the alleged extrapolated overpayments are not tied to individual physicians and suppliers, which is necessary for the Funds to seek recoupment from the physicians and suppliers.

140.    Extrapolation is inconsistent with the Coal Act because it transfers funds to the Medicare program that are statutorily mandated for the care of beneficiaries of the Funds' non-Medicare plans of benefits.  The Secretary cannot undermine the Coal Act by diverting funds from retiree health benefits that should instead be recouped from physicians and suppliers.  For this reason, only the overpayments identified in the actual audit may be recouped.  Therefore, the Coal Act constrains the Secretary's authority to extrapolate against the Funds.

## COUNT VII
## Violation of Section 404(a)(1) of ERISA - Extrapolation

141.     Plaintiffs reallege and incorporates by reference paragraphs 1–88 as if fully set forth below.

142.     Section 404(a)(1) of ERISA sets forth the duties of a fiduciary.  An ERISA fiduciary has a duty to collect overpayments.  *See Best v. Cyrus*, 310 F.3d 932, 936 (6th Cir. 2002).  Accordingly, ERISA requires that the Funds have a means to recoup any overpayments made to physicians.

143.     The Secretary alleges that the physicians and suppliers in question were paid for services that are not health benefits, either because the physicians and suppliers did not provide the services as billed or that they provided medically unnecessary services.  The extrapolated demand thrusts upon the Funds a loss for which there can be no reimbursement from the individual physicians and suppliers who allegedly billed Medicare improperly because the extrapolated overpayment is not associated with any known individual physician or supplier claims.

144.     Extrapolation is inconsistent with ERISA because it transfers funds to the Medicare program that are statutorily mandated for the care of beneficiaries of the Funds' non-Medicare plans of benefits.  The Medicare program cannot undermine ERISA by diverting funds from retiree health benefits that should instead be recouped from physicians and suppliers.  For this reason, only the overpayments identified in the actual audit may be recouped.  The Secretary's extrapolation violates this statutory scheme by assessing overpayments against the Funds that the Funds cannot recoup from physicians and suppliers.

## COUNT VIII
## Violation of the APA

145.     Plaintiffs realleges and incorporates by reference paragraphs 1–88 as if fully set

forth below.

146.    Under the APA, a final decision of the Secretary is unlawful and must be set aside

if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).

147.    The Secretary's imposition of an additional two percent reduction on the Funds'

reasonable costs of health care services provided between April 1, 2013, and December 31, 2013,

which effectively increased the sequestration reduction for Part B services to four percent, is

arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.  As

described in detail above, the Secretary's duplicate sequestration adjustment violates the

BBEDCA, the Medicare statute, the Coal Act, and ERISA.

148.    In addition, the Secretary's extrapolation of alleged overpayments in connection

with the Funds' reasonable costs of health care services provided between January 1, 2012, and

December 31, 2013, is arbitrary, capricious, an abuse of discretion, and otherwise not in

accordance with the law.  As discussed above, the Secretary improperly extrapolated the

contractors' audit findings in violation of the Coal Act and MMA § 935(a).

### RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request relief as follows:

1.    A declaration by the Court that the Secretary's imposition of an additional two

percent reduction on the Funds' reasonable costs of health care services provided between April

1, 2013 and December 31, 2013, which effectively increased the sequestration reduction for Part

B services to four percent, contravenes federal law.

2.    A declaration by the Court that the Secretary's extrapolation of alleged

overpayments in connection with the Funds' reasonable costs of health care services provided

between January 1, 2012, and December 31, 2013, should be reversed, and payment should be withheld only for the claims actually audited and denied.

3.      A declaration by this Court that the final decision of the Secretary as to the imposition of an additional two percent reduction on the Funds' reasonable costs of healthcare services provided between April 1, 2013, and December 31, 2013, and the extrapolation of alleged overpayment against the Funds in connection with the costs of healthcare services provided between January 1, 2012, and December 31, 2013, must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

4.      An order requiring the Secretary to recalculate Plaintiffs' Medicare reimbursement from January 1, 2012, through December 31, 2013.

5.      An order by this Court requiring the Secretary to pay the Plaintiffs interest on the payments resulting from the Court's orders.

6.      An order by this Court awarding Plaintiffs the costs and fees incurred in this litigation and granting such other relief in law and/or equity as this Court may deem just and proper.

Respectfully submitted,

*/s/ Ronald S. Connelly*
Ronald S. Connelly
D.C. Bar No. 488298
POWERS PYLES SUTTER & VERVILLE, PC
1501 M Street, N.W., 7th Floor
Washington, DC 20005
Tel. (202) 872-6762
Fax (202) 785-1756
Ron.Connelly@PowersLaw.com

*/s/Leela Baggett*
Leela Baggett

D.C. Bar No. 1030000
POWERS PYLES SUTTER & VERVILLE, PC
1501 M Street, N.W.
Seventh Floor
Washington, DC 20005
tel. (202) 466-6550
fax (202) 785-1756
Leela.Baggett@PowersLaw.com

*/s/Carolyn Dutrow*
Carolyn Dutrow, General Counsel
D.C. Bar No. 451350
UNITED MINE WORKERS OF AMERICA
HEALTH AND RETIREMENT FUNDS
2121 K Street, NW
Washington, DC 20037
Tel. (202) 521-2230
Fax (202) 530-4030
CDutrow@UMWAFunds.org

Attorneys for Plaintiffs

Dated:  November 24, 2023