UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHEAL W. BUCKNER, *et al.*,

    *Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of Health and Human Services*,[1]

    *Defendant*.

Civil Action No. 23-03524 (AHA)

## Memorandum Opinion

Plaintiffs are trustees of an employee benefit plan that provides health benefits to retired coal miners and their dependents. They challenge two conclusions of the Secretary of Health and Human Services resulting in adjustments to their Medicare reimbursement in 2012 and 2013. The parties each move for summary judgment. For the reasons below, the Court upholds the Secretary's conclusions. The Court accordingly denies the trustees' motion for summary judgment and grants the Secretary's cross motion.

I.    **Background**

Medicare is a health insurance program for individuals who are over the age of sixty-five or have disabilities. Medicare Part A generally pays for inpatient services by hospitals and other care providers. *See* 42 U.S.C. §§ 1395c to 1395i-6. And relevant here, Medicare Part B is an

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of Health and Human Services Robert F. Kennedy, Jr., is "automatically substituted" as the defendant.

optional supplemental insurance program that pays for other services, like physician visits, outpatient care, lab tests, and medical equipment. *See id.* §§ 1395j to 1395w-6.

The plan at issue in this case is a particular type of Part B plan known as a "health care prepayment plan." Generally, the Centers for Medicare and Medicaid Services ("CMS") make Part A and Part B payments directly to health care providers, through third party contractors. A prepayment plan, however, may pay for Part B services on behalf of its enrollees and then be reimbursed for the reasonable cost of those services. *Id.* § 1395*l*(a)(1)(A); *see also* 42 C.F.R. § 417.800(a). A prepayment plan generally must "[f]urnish physicians' services through its employees or under a formal arrangement with a medical group, independent practice association or individual physicians." 42 C.F.R. § 417.800(b)(1)(ii). However, certain prepayment plans, including the one here, have been grandfathered in as a prepayment plan, and can accordingly be reimbursed on a reasonable cost basis, even if they do not furnish physician services through their own employees or under a formal arrangement. *Id.* § 417.800(b)(2) (grandfathering in plans being reimbursed on a reasonable cost basis as of January 1983 that file an agreement with CMS). In paying for Part B items and services for its enrollees, a prepayment plan is responsible for determining the eligibility of individuals to receive those items and services, making coverage decisions and appropriate payment for the items and services for which its Medicare enrollees are eligible, and carrying out other procedures CMS may require. *Id.* §§ 417.533, 417.802; *see* Medicare Managed Care Manual, ch. 18a, § 10.2.

A prepayment plan is required to keep records and statistical data sufficient to support costs payable by CMS. 42 C.F.R. §§ 417.568, 417.802. CMS generally makes monthly advance payments to the prepayment plan based on the estimated cost of providing covered services to the plan's Medicare enrollees. *Id.* §§ 417.570(a)–(b), § 417.808. At the end of the fiscal year, a

prepayment plan must submit a cost report for providing Part B covered services to its Medicare enrollees. *Id.* § 417.810(b)(1)–(2). CMS then reviews the plan's final cost report and determines whether an audit is necessary. *Id.* § 417.576. After the audit, or earlier if there is no audit, CMS determines the total reimbursement due to the plan for the year and calculates the amount owed to CMS or to the plan based on the difference between the total amount due and the advance payments already made. *Id.* § 417.810(c). The party owing the difference, whether CMS or the plan, pays it within thirty days. *Id.* § 417.810(d)(1).

The plaintiffs are trustees of four United Mine Workers of America health benefit plans, collectively referred to here as "the plan." *See* ECF No. 15-1 at 1 n.1. The plan provides health benefits to retired coal miners and their dependents. Administrative Record ("AR") 2257; *see* ECF No. 1 ¶ 13. As a health care prepayment plan that has been grandfathered into the Medicare Part B regime, the plan does not furnish or formally arrange physicians' services; its enrollees may visit any qualified participating physician. AR 1060. If the enrollee is a Medicare beneficiary, the physician bills the plan for any Part B services and the plan then pays the claim to the physician based on the Medicare fee schedule. *Id.* The plan then submits its annual cost report to CMS, which determines the reimbursement due. AR 1060–61.

This case concerns the plan's 2013 cost report and reimbursement, which was affected by a budgetary process known as sequestration. In 2011, Congress amended the Balanced Budget and Emergency Deficit Control Act of 1985 to impose spending reductions on federal agencies beginning in 2013. Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240. The statute directs the Office of Management and Budget ("OMB") to prepare and the President to order the reductions, and it caps the reduction for Medicare spending at two percent. 2 U.S.C. § 901a(6)(A). The statute also sets Medicare-specific rules for when sequestration must be applied and for which

entities receive the two percent reduction. *Id.* § 906(d)(1), (3). In March 2013, OMB issued a sequestration report noting the maximum two percent Medicare reduction. OMB Report to the Congress on the Joint Committee Sequestration for Fiscal Year 2013 at 1, 4 (Mar. 1, 2013), https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/legislative_reports/fy13ombjcsequestrationreport.pdf. The President also issued an executive order implementing sequestration. Sequestration Order for Fiscal Year 2013 Pursuant to Section 251A of the Balanced Budget and Emergency Deficit Control Act, as Amended, 78 Fed. Reg. 14633 (Mar. 1, 2013).

Later in March, CMS issued a memorandum stating that it would implement a two-percent reduction beginning on April 1, 2013. AR 2197. CMS issued more detailed guidance in a May 2013 memorandum stating that the two percent reduction applied to "all plans and plan types," including health care prepayment plans. AR 2205. A December 2013 memorandum provided additional information on how to calculate the sequestration adjustment, and further guidance issued in early 2014 indicated that costs had to reflect actual payments made to physicians, regardless of any reductions imposed. AR 2213, 2215.

The plan responded to sequestration and CMS's March memorandum by modifying its own claims processing system to lower by two percent the payments it made to physicians and suppliers who provided Part B services to the plan's beneficiaries. AR 1063–64. In March 2014, the plan informed CMS that it had reduced its payments to physicians by two percent and therefore no sequestration reduction was necessary. AR 1802–03. CMS rejected that method of calculation and assessed a two percent reduction on the plan's 2013 cost report. AR 1802, 2215, 2230. The plan paid about $1.6 million to CMS under protest in August 2014. AR 2618.

In July 2017, CMS issued the plan's notice of program reimbursement for fiscal years 2012 and 2013. AR 1834–36. The plan appealed. AR 2247. It challenged CMS's sequestration

adjustment to the plan's 2013 cost report, as well as CMS's use of extrapolation in audits of the plan's 2012 and 2013 cost reports to claim over $1.5 million in coding and billing discrepancies. AR 2248–50. The CMS hearing officer sided with the plan, finding the agency's sequestration reduction and use of extrapolation were improper. AR 955. The CMS Administrator reviewed that decision and reversed on both issues, concluding that the sequestration reduction and use of extrapolation were permissible. AR 828. After the hearing officer adopted the Administrator's ruling on remand, the trustees filed this suit challenging that final agency action. AR 35. Both parties have moved for summary judgment. ECF Nos. 15, 17.

## II.  Discussion

The Administrative Procedure Act provides judicial review of final agency action. 5 U.S.C. §§ 702, 704. A court must "hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). In doing so, the court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706; *see, e.g.*, *Lake Region Healthcare Corp. v. Becerra*, 113 F.4th 1002, 1007 (D.C. Cir. 2024). The court's review is limited to the administrative record. *Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 878 (D.C. Cir. 2021). Here, the trustees argue the Secretary acted contrary to law by (1) reducing the plan's 2013 reasonable costs by two percent, and (2) using extrapolation for the 2012 and 2013 cost reports. However, the Court concludes the Secretary acted consistent with the law.

### A.  The Secretary's Sequestration Reduction Was Not Unlawful

The trustees argue the Secretary acted unlawfully in reducing the plan's 2013 reasonable costs by two percent because of sequestration. According to the trustees, the plan took care of the sequestration reduction itself by reducing its payments to physicians and suppliers by two percent.

5

The Secretary, on the other hand, says the government, through CMS, was obligated to impose a two percent reduction to the costs reported by the plan, irrespective of whether the plan reduced its own payments to physicians. The Secretary's understanding of the law is the correct one.

The core of the trustees' argument is that sequestration was implemented by obligating the plan to reduce its outlays, rather than obligating the government to reduce its outlays. But that's not so. Neither the relevant statute nor regulations implemented sequestration by directing private parties, like the plan, to make reductions; they did so by directing federal government entities—here, CMS—to reduce outlays. The Budget Control Act required OMB to calculate and the President to "sequester" funds through "cancellation of budgetary resources provided by discretionary appropriations or direct spending law." 2 U.S.C. § 900(c)(2); *see id.* § 901a; *Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 769 (D.C. Cir. 2022) (recognizing that the Budget Control Act "aimed to reduce federal government spending via certain budgetary devices"). The statute's Medicare provisions similarly direct their mandates to the government entities, providing that "[t]o achieve the total percentage reduction" in Medicare programs, "OMB shall determine, and the applicable Presidential order . . . shall implement, the percentage reduction that shall apply." 2 U.S.C. § 906(d)(1). The Act goes on to specify how and when the government should apply the reductions. *See id.* § 906(d)(1)(A)–(B), (3).

CMS's guidance likewise imposed no responsibility on plans to carry out reductions and, to the contrary, tracked the statute in implementing sequestration through reduction in the federal government's outlays. CMS's first memorandum in March 2013, sent to all cost plans including the plan here, addressed Medicare Advantage plans and Part D sponsors. AR 2197. It stated that the agency's "payments made to [those plans and sponsors] will generally be reduced by two percent in accordance with the Balanced Budget and Emergency Deficit Control Act of 1985, as

6

amended," and that "CMS will report sequestration adjustments to plans on the Monthly Plan Payment Report." *Id.* CMS's policy guidance just over a month later stated that "[p]ayments to all plans and plan types are subject to sequestration," explicitly listing the type of plan here, and that "[t]he two percent reduction is applied to the Net Capitation Payment (NCP) made to plans." AR 2205. That guidance further specified that the type of plan here was "subject to sequestration in the same manner described" and that "the reduction in payment will apply to the cost reports submitted by" the plan. *Id.* CMS's guidance toward the end of 2013 similarly stated that the agency's payments to plans of the type here "will be reduced by 2% in accordance with the Balanced Budget and Emergency Deficit Control Act of 1985, as amended." AR 2213; *see also* AR 2215 (February 2014 memorandum stating that "the 2% payment reduction applies to the [managed care organizations'] reimbursable costs for the period covered by the sequestration" (emphasis omitted)). The guidance consistently described CMS reducing its payments to plans to implement sequestration, not plans themselves reducing their payments, and the trustees identify nothing in the policy guidance that directed the plan to implement the reductions.

To argue that the Budget Control Act implemented sequestration through the plan, the trustees isolate Medicare-specific language in the statute and argue that it creates a different regime for their particular type of grandfathered prepayment plan. ECF No. 15-1 at 26–27. For example, after stating that "OMB shall determine, and the applicable Presidential order . . . shall implement, the percentage reduction that shall apply," the Act specifies details as to how the federal government should do so—namely, whether OMB and the President should go about calculating and implementing reductions against individual payments or monthly payments:

> (A) in the case of parts A and B of [title XVIII of the Social Security Act], to individual payments for services furnished during the one-year period beginning on the first day of the first month beginning after the date the order is issued . . . ; and

7

> (B) in the case of parts C and D, to monthly payments under contracts under such parts for the same one-year period;
>
> such that the reduction made in payments under that order shall achieve the required total percentage reduction in those payments for that period.

2 U.S.C. § 906(d)(1). Here, the trustees argue that the plan falls under paragraph (A) as a Part B plan and that the paragraph's reference to "individual payments for services" supports the plan's reduction of its individual payments to physicians. ECF No. 15-1 at 26–27. The trustees similarly try to isolate language in this subsequent provision about when the government is to apply reductions:

> **(A) In general**
>
> Except as provided in subparagraph (B), if a reduction is made under paragraph (1) in payment amounts pursuant to a sequestration order, the reduction shall be applied to payment for services furnished during the effective period of the order. . . .
>
> **(B) Payment on the basis of cost reporting periods**
>
> In the case in which payment for services of a provider of services is made under [title XVIII of the Social Security Act] on a basis relating to the reasonable cost incurred for the services during a cost reporting period of the provider, if a reduction is made under paragraph (1) in payment amounts pursuant to a sequestration order, the reduction shall be applied to payment for costs for such services incurred at any time during each cost reporting period of the provider any part of which occurs during the effective period of the order, but only (for each such cost reporting period) in the same proportion as the fraction of the cost reporting period that occurs during the effective period of the order.

2 U.S.C. § 906(d)(3). Here, the trustees also argue that the plan falls under paragraph (A) because the plan, as a unique grandfathered prepayment plan, is not a "provider of services," as required for paragraph (B). ECF No. 15-1 at 27. And they say paragraph (A)'s statement that "the reduction shall be applied to payment for services furnished" supports the plan's reduction of its individual payments to physicians. *Id.*

8

The notion that these provisions reassigned the obligation to implement sequestration from the government to private parties, like the plan, is not persuasive. It ignores the rest of the text, which makes crystal clear that the subject—the actor who is to administer the reductions—is the government: it is OMB that "shall determine" and the President who "shall implement" the reductions in accordance with the regulations. 2 U.S.C. § 906(d)(1). Nothing in the text of these paragraphs purports to obligate a private party, like the plan, to reduce payments to achieve the goals of sequestration on behalf of the government. Moreover, even assuming the trustees identify the correct paragraphs that would apply to the plan here, direction to the federal government to calculate and implement reductions against the "individual payments for services furnished" instead of against monthly payments, or that "the reduction shall be applied to payment for services furnished," would include reductions in outlays to the plan for such individual payments for services furnished. *Id.* § 906(d)(1)(A), (3)(A).[2] The trustees accordingly identify nothing in the statute—or any OMB, presidential, or CMS guidance—that directed the plan to implement sequestration reductions, rather than the government.[3]

---

[2]  The Secretary makes a compelling case that the trustees have misidentified the paragraphs that would apply to the plan here. ECF No. 17-1 at 33–36. He argues that, given the nature of the prepayment plan, CMS would have been correct to consider it akin to a Part C or Part D plan and reduce monthly payments under 2 U.S.C. § 906(d)(1)(B). He also asserts that, even though the plan is not "a provider of services," the government's payments to the plan were "payment for services of a provider of services." 2 U.S.C. § 906(d)(3)(B). But irrespective of which paragraphs the plan falls under, none of the paragraphs directed the plan, rather than the government, to implement sequestration.

[3]  As described, CMS generally pays health care providers, such as hospitals and physicians, directly for Medicare Part A and Part B services. It does so by contracting with Medicare administrative contractors ("MACs") to serve as intermediary agents in different geographic jurisdictions. *See* 42 U.S.C. § 1395kk-1; *see also* ECF No. 23 at 15 (noting that MACs "apply sequestration at the direction of CMS"). To the extent the trustees argue the plan is akin to a MAC and was therefore justified in reducing its payments, that argument is unpersuasive. The relationship between CMS and MACs—agents hired to make reimbursements as directed by, and on behalf of, the government—is fundamentally different from CMS's relationship with plans and

9

The trustees separately argue that CMS's sequestration reduction violated several other laws: the Coal Act, the Medicare statute, and the Employee Retirement Income Security Act ("ERISA"). Their arguments are similar with respect to each statute—that CMS's application of a sequestration reduction unlawfully takes funds from their plan beneficiaries. The trustees argue the Coal Act restricts plan funds for the provision of health benefits for plan beneficiaries, not for payment to CMS to cover a sequestration reduction. ECF No. 15-1 at 31–33. Similarly, they say paying CMS to cover the reduction violates the Medicare statute because the plan would use assets that might otherwise be used for non-Medicare beneficiaries, which is prohibited. *Id.* at 33–34. And the trustees contend that paying for the sequestration reduction violates ERISA because plan assets must be held in trust and used exclusively to provide benefits to participants. *Id.* at 34–36. According to the trustees, this is "a zero-sum game," so implementing the reduction necessarily takes these funds from beneficiaries. ECF No. 18 at 27.

These arguments are not persuasive. They all begin from the same flawed premise that the sequestration reduction is seizing plan funds when, in fact, CMS is calculating the total amount to be reimbursed to the plan after receiving its annual cost report, according to the law governing the calculation of that reimbursement. It is true, of course, that the plan may have had fewer funds available overall than it would have if sequestration laws had not been enacted by Congress and implemented by the federal government. But sequestration laws were enacted and implemented. As the Secretary explains, he simply reduced Medicare payments to the plan "as he did for all other health care cost prepayment plans in accordance with the sequestration requirements of the

---

providers that receive those reimbursements. *See* ECF No. 18 at 5 (acknowledging the trustees do not argue the plan "actually is a MAC").

Control Act and the Medicare statutory and regulatory provisions governing reasonable cost reimbursement." ECF No. 23 at 22.

Indeed, as the Secretary points out, the trustees' argument would render the plan here an outlier. In reducing its own payments to physicians by two percent, the plan essentially passed the costs of sequestration on to physicians and "was shielded from the effects of sequestration." ECF No. 17-1 at 27. And according to the Secretary, "no other health care prepayment plans followed the same course as these Plaintiffs." ECF No. 23 at 12. In other words, the import of the Secretary's interpretation is to treat the plan like all other plans.

### B. The Secretary's Use Of Extrapolation Was Not Unlawful

The trustees also challenge the Secretary's reliance on extrapolation in audits of the plan's 2012 and 2013 cost reports. ECF No. 15-1 at 36–37. For each year, CMS's audit contractors tested a random sample of "claim lines" submitted by the plan and examined them for billing and coding errors, including to confirm that services claimed were actually covered, paid only once, and reasonably priced. AR 2093–98, 2139–45. Based on the number of erroneous claims in the sample and the costs associated with those claims, the auditors calculated a weighted error rate and used that rate to extrapolate the cost associated with error across all claims. AR 2098, 2144. For 2012, the auditors tested 374 claim lines and identified eight errors overstating costs by $424.56. AR 2093. They used this to calculate a weighted error rate of 1.15% that, extrapolated across all paid claims, resulted in an adjustment of $279,271. AR 2098; *see also* AR 1843. For 2013, the auditors tested 364 claim lines and identified thirteen errors overstating costs by $807.55. AR 2139. They used this to calculate a weighted error rate of 2.84% that, extrapolated across all paid claims, resulted in an adjustment of $1,327,525. AR 2144; *see also* AR 1951.

The trustees argue this use of extrapolation violated three statutes. First, they argue it violated the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, which

11

provides: "A medicare contractor may not use extrapolation to determine overpayment amounts to be recovered by recoupment, offset, or otherwise unless the Secretary determines that—(A) there is a sustained or high level of payment error; or (B) documented educational intervention has failed to correct the payment error." 42 U.S.C. § 1395ddd(f)(3). The trustees assert that the auditors are "medicare contractors" and thus are subject to the requirements of § 1395ddd(f)(3). ECF No. 15-1 at 42. And while the auditors imposed a "materiality" threshold of 1% before implementing extrapolation, the trustees maintain that a "material" error rate is not the same as one that is "sustained" or "high," as the statute requires. *Id.* at 42–45.[4]

Assuming § 1395ddd(f)(3)'s requirements apply, the trustees' challenge to the auditors' materiality threshold is unconvincing. The trustees contend the use of extrapolation was unlawful because the auditors never stated that the error rate was "sustained" or "high," rather than merely "material." *Id.* But setting aside the specific language used, the point is that Sagebrush did, in fact, adopt a threshold for when to impose extrapolation, stating the method would be used only when the weighted error rate exceeded 1%. AR 2098, 2144. And the statute provides that the agency's

---

[4] The provision of the Medicare Modernization Act that the trustees rely on applies only to "medicare contractors," defined as "(1) [a] medicare administrative contractor with a contract under section 1395kk-1 of this title, including a fiscal intermediary with a contract under section 1395h of this title and a carrier with a contract under section 1395u of this title," or "(2) [a]n eligible entity with a contract under section 1395ddd of this title." 42 U.S.C. § 1395zz(g); *see id.* § 1395ddd(f)(2)(C). The trustees claim that documents in the administrative record show one of the audit contractors that conducted the sampling and calculated the weighted error rate, Sagebrush Solutions, satisfies this definition because it was awarded "a contract for medical claims review" and "performed activities described under section 1395ddd." ECF No. 18 at 35. The trustees point to an attachment to a contract solicitation that referenced section 1893 of the Social Security Act (which is codified at § 1395ddd) in its background section. *Id.* (citing AR 1323). But the document referenced does not show Sagebrush has a "contract under section 1395ddd"; it simply mentions that section 1893 "established the Medicare Integrity Program" to "strengthen CMS' ability to deter waste, fraud and abuse in the Medicare program." AR 1323. While the Court ultimately need not resolve the issue, it is not clear Sagebrush is a "medicare contractor" within the meaning of the statute.

12

choice of threshold is not subject to judicial review. *See* 42 U.S.C. § 1395ddd(f)(3) ("There shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise, of determinations by the Secretary of sustained or high levels of payment errors under this paragraph."); *see also Mansfield Ambulance, Inc. v. Dep't of Health & Hum. Servs.*, No. 16-cv-2016, 2017 WL 1953469, at *3 (N.D. Ohio May 10, 2017) ("It is implicit in defendant's use of extrapolation to calculate the repayment that defendant determined the rate to be 'high.'"). The use of extrapolation accordingly did not violate the Medicare Modernization Act.

Separately, the trustees argue that extrapolation violated the Coal Act and ERISA. At bottom, the trustees essentially contend that extrapolation was unlawful because the plan has no way to recover erroneous overpayments from physicians and suppliers where those overpayments were extrapolated and not specifically identified by the auditors. ECF No. 15-1 at 36. It follows, according to the trustees, that extrapolation "effectively seizes funding that is obligated by law to be used exclusively for furnishing health care benefits" and that this approach contravenes provisions of the Coal Act and ERISA. *Id.*; *see id.* at 40–41 ("The statutory purpose of the Coal Act is to provide 'delivery of health care benefits for the beneficiaries' of the [plan's] health plans." (quoting Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, § 19142, 106 Stat. 2776, 3037)); *id.* at 42 ("Extrapolation is inconsistent with ERISA because it transfers funds to the Medicare program that are statutorily mandated for the care of beneficiaries of the [plan's] non-Medicare plans of benefits.").

But, as with the trustees' sequestration argument, this misstates what is happening. The use of extrapolation does not "seize" funds meant for non-Medicare benefits. Extrapolation simply reduced the total amount CMS was to reimburse the plan for costs. The plan, of course, may have ended up with fewer funds available if extrapolation of billing and coding errors led to a lower

13

reimbursement, but that calculation does not mean that CMS violated the Coal Act or ERISA. Extrapolation and sampling are well-established tools for calculating overpayments, including in the context of reasonable cost determinations. *See, e.g.*, *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 918–19 (D.C. Cir. 1991) (collecting cases and observing that "[t]he logic of sample adjudication, accepted by courts that have approved the technique in other contexts, is that any minor errors will tend to balance out in the end"); *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005) (noting that "sampling of similar claims and extrapolation from the sample is a recognized method of proof"). And there is no dispute that, as a prepayment plan, the plan is subject to reasonable cost reimbursement. *See* 42 U.S.C. § 1395*l*(a)(1)(A).[5]

### III.    Conclusion

For these reasons, the trustees' motion for summary judgment is denied, and the Secretary's cross motion for summary judgment is granted. The trustees' motions to strike and for leave to file a sur-reply are denied as moot.

A separate order accompanies this memorandum opinion.

                                                                          AMIR H. ALI
                                                                          United States District Judge

Date:   August 1, 2025

---

[5] After the Secretary filed his reply brief, the trustees moved to strike portions of the reply or, in the alternative, for leave to file a sur-reply. ECF Nos. 24, 25. Both motions are denied as moot because the portions of the Secretary's brief to which the trustees object are not material to the Court's conclusions.